CITY OF HARTFORD et al.

v.

Carla A. HILLS et al.

Civ. No. H–75–258.

United States District Court,
D. Connecticut.

Jan. 28, 1976.

Barry S. Zitser, Corp. Counsel, Hartford, Conn., Mary R. Hennessey, Connecticut Justice Commission, Hartford, Conn., Richard Bellman, Suburban Action Institute, New York, N. Y., for plaintiffs.

Peter C. Dorsey, U. S. Atty., Marjorie Wilhelm, Asst. U. S. Atty., New Haven, Conn., David Epstein, Department of Justice, Washington, D. C., Anthony C. Ward, Windsor Locks, Conn., Walter A. Twachtman, Jr., Rocky Hill, Conn., John D. Adams, Enfield, Conn., Philip R. Dunn, John J. Langenbach, Corp. Counsel, West Hartford, Conn., Martin B. Burke, Vernon, Conn., F. Timothy McNamara, Hartford, Conn., Lloyd Frauenglass, Bradley B. Bates, Palmer S. McGee, Jr., Thomas J. Groark, Jr., Francis Morrison, Day, Berry & Howard, Hartford, Conn., for defendants.

MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

I.

This case is the culmination of a confrontation between the City of Hartford and seven of its suburban towns. At issue is the propriety of the decision by the United States Department of Housing and Urban Development (HUD) to approve federal community development grants to these towns. The plaintiffs contend that this approval was improper, because of the emphasis in the applications on non-housing expenditures, and upon local rather than regional needs.[1]

---

1. The funds are available under the Housing and Community Development Act of 1974. Pub.L.No.93–383; 88 Stat. 633; 42 U.S.C. § 5301 et seq. (1975 Supp.).

The plaintiffs are the City of Hartford, Connecticut; eight city officials;[2] and two representatives of a class consisting of minority, as well as low and moderate income, persons now living "in deteriorating, inadequate, or overly-costly housing in the City of Hartford, Connecticut."[3] The plaintiffs seek declaratory and injunctive relief against the seven towns,[4] the Secretary and other officials[5] of the Department of Housing and Urban Development, and the Department itself. The plaintiffs claim that the defendant officials have failed to live up to their obligations under Title I of the Housing and Community Development Act of 1974,[6] Title VIII (Fair Housing) of the Civil Rights Act of 1968,[7] and Title VI of the Civil Rights Act of 1964.[8] They also assert constitutional claims under the civil rights statutes[9] and the fifth amendment.

Specifically, the plaintiffs claim that the federal defendants abused their discretion in that they approved applications for community development funds under the 1974 Act although the statutory review standards mandated that the applications be disapproved. Similarly, they claim that HUD contravened Title VIII of the 1968 Act by failing to "affirmatively administer" the community development program in order to expand low and moderate income housing opportunities in Hartford's suburbs. Finally, they allege that HUD violated Title VI of the 1964 Act by approving these community development grant applications "in the face of a history by these applicant communities of discriminatory housing, zoning, and land use practices. . . ."[10]

■ A hearing was held on the plaintiffs' motion for a preliminary injunction, and the defendants' motion to dismiss or in the alternative for summary judgment. Shortly thereafter the defendants were preliminarily enjoined from "spending in any fashion" the funds at issue in this case. Later that order was modified to permit the release of urgently needed funds, most of which were expended for housing-related purposes. At the hearing on the modification request all parties agreed that final judgment could be entered on the basis of the record as it had been developed up to that point, and as it would be supplemented by several affidavits. All of those affidavits have now been filed, and the case is before me for a decision on the merits.[11]

## II.

■ Jurisdiction is present under 28 U.S.C. § 1331 since the grants which are the subject of this controversy total well over $10,000. Jurisdiction is also present under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq. Evans v. Lynn*, No. 74–1793 (2d Cir. June 2, 1975) (Gurfein, J., concurring), *rehearing en banc granted* August 11, 1975. A class action is not necessary in this case, since

---

2. All eight are members of the Hartford Court of Common Council—the city's governing body.

3. Paragraph 11 of the Complaint. These plaintiffs' Motion for Permission to Proceed In Forma Pauperis was granted on August 11, 1975.

4. The seven towns whose grant applications are challenged are: East Hartford, Enfield, Farmington, Glastonbury, Vernon, West Hartford, and Windsor Locks. The towns were ordered joined, as additional defendants, on the motion of the United States Department of Housing and Urban Development.

5. In addition to the Secretary, both the Regional Administrator and Area Director of HUD are named as defendants. All three are sued only in their official capacities.

6. Cited in note 1 *supra.*

7. Pub.L.No.90–284; 82 Stat. 81; 42 U.S.C. § 3601 *et seq.*

8. Pub.L.No.88–352; 78 Stat. 252; 42 U.S.C. § 2000d *et seq.*

9. 42 U.S.C. §§ 1981, 1982, and 1985.

10. Paragraph 31 of the Complaint.

11. The United States has recently filed a Supplemental Motion to Dismiss or in the Alternative for Summary Judgment, based upon newly-proposed HUD regulations. 24 C.F.R. § 570.303; 41 Fed.Reg. 2347 (Jan. 15, 1976). Although these regulations concern the "expected to reside" section of the Housing Assistance Plan for future grant applications, they were not, obviously, used in evaluating the grants challenged in this case. Accordingly, I do not consider them in this decision.

full injunctive and/or declaratory relief awarded on behalf of the named plaintiffs will also benefit their class. 3B *Moore's Federal Practice*, § 23.40 (Supp.1974). Furthermore, the definition of the class is not sufficiently detailed to warrant certification. *Warth v. Seldin*, 422 U.S. 490, 494–95 n. 5, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

## III.

The plaintiffs are faced, at the threshold, with a challenge to their standing to bring this action. The defendants argue that all of the plaintiffs lack standing, and ask that the complaint be dismissed for failure to state a claim upon which relief may be granted. I decline to accept that invitation, because I find that several of the plaintiffs do, in fact, possess standing to bring this action.

The issue of the standing of the City of Hartford has already been addressed twice by this court, and both times I have ruled that the City does have standing to sue.[12] It may be helpful, however, to recount briefly the basis upon which that conclusion was reached.

The Housing and Community Development Act of 1974 speaks directly to the problems confronting our urban areas. The initial clauses of the statute read:

"(a) The Congress finds and declares that the Nation's cities, towns, and smaller urban communities face critical social, economic, and environmental problems arising in significant measure from—

(1) the growth of population in metropolitan and other urban areas, and the concentration of persons of lower income in central cities; and

(2) inadequate public and private investment and reinvestment in housing and other physical facilities, and related public and social services, resulting in the growth and persistence of urban slums and blight and the marked deterioration of the quality of the urban environment.

"(b) The Congress further finds and declares that the future welfare of the Nation and the well-being of its citizens depend on the establishment and maintenance of viable urban communities as social, economic, and political entities . . . .

"(c) The primary objective of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." [13]

The plaintiffs have filed a number of affidavits detailing the problems facing the City of Hartford.[14] The figures con-

---

**12.** Memorandum of Decision on Plaintiffs' Motion for a Preliminary Injunction, September 30, 1975; and Ruling on Defendants' Motions *to Reconsider and to Amend Preliminary Injunction*, October 29, 1975. The City participated in the A–95 administrative review process, and may also have "person aggrieved" standing under 5 U.S.C. § 702. In light of my prior decisions, I need not resolve that issue.

**13.** 42 U.S.C. § 5301 (1975 Supp.).

**14.** The affidavits submitted by the plaintiffs strongly support the view that Hartford is one of the American central cities, suffering from a concentration of lower-income persons, that the Act was designed to benefit. The City's Department of Social Services administers between 40 and 45 per cent of all town general assistance cases in the entire state, and about 35,000 City residents receive either town general assistance or state public assistance. Plaintiffs' Exhibit 11, Affidavit of Joseph Alleyne, Director of the Department of Social Services, City of Hartford, September 18, 1975. Furthermore, over half of the City's residents either receive such assistance or live exclusively on social security or unemployment benefits. In July 1975, the City's unemployment rate stood at 13.6 per cent. The 1970 Census found that Hartford's population was 35.5 per cent minority, and that percentage has *increased since then. The school population* now is over 80 per cent minority. Plaintiffs' Exhibit 9, Affidavit of Richard Suisman, Member, Hartford Court of Common Council, September 18, 1975.

The housing situation in Hartford is bleak. There are now 16,000 substandard, deteriorat-

tained therein have not been challenged by the defendants. Thus, there can be no doubt that the statute was intended to ameliorate the problems facing the City of Hartford. The plaintiffs' allegations, and the statutory language, make it clear that the City falls within the "zone of interests" created by the Act. Cf. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

■ Similarly, the statute itself demonstrates that the second prong of the standing test—the "injury-in-fact" requirement—is met here. The statute explicitly provides for the reallocation of funds from grants which are disap-

proved, "first, in any metropolitan area in the same State . . . ." 42 U.S.C. § 5306(e) (1975 Supp.). Thus, if the plaintiffs are successful in their effort to overturn HUD's approval of these grant applications, and if the funds at issue are made available for reallocation, Hartford will be eligible to receive them, and will have a strong statutory priority. This priority is strengthened by the current HUD Regulations. As I noted in my decision modifying the preliminary injunction previously entered in this case,[15] one regulation in particular, 24 C.F.R. § 570.409(f)(1)(i); 40 Fed.Reg. 42347, 42349 (September 12, 1975), requires that such reallocation funds be disbursed with

ing or dilapidated units in the City. About one-half of the City's families pay over 25 per cent of their annual income for shelter. In addition, most of the subsidized housing in the Greater Hartford Region is already located in the City of Hartford. Hartford has 61 per cent of these units although it has only 24 per cent of the total population of the region. Specifically, 71 per cent of the low-rent public housing, 46 per cent of the moderate-rent public housing, and 59 per cent of the privately-sponsored subsidized housing units are located within the City. And the majority of the subsidized moderate rental public housing units located within the suburbs are for elderly housing. Plaintiffs' Exhibit 10, Second Affidavit of William Slitt, Director of Housing, City of Hartford, September 16, 1975.

The condition of the City of Hartford, described above, stands in marked contrast to that which prevails in its suburban towns, as is demonstrated by a report prepared for HUD by Richard P. Nathan, a Senior Fellow at The Brookings Institution. *The Record of The New Federalism: What It Means For The Nation's Cities,* The Brookings Institution, Washington, D. C., September 30, 1974. Exhibit A to Plaintiffs' Memorandum In Opposition to Motion to Dismiss or in the Alternative for Summary Judgment. This report uses six factors to compare conditions in 58 core cities with those in their suburbs. The six factors considered were: unemployment; population age; educational levels; per capita income; poverty percentage; and housing overcrowding percentage. The disparity between Hartford and its suburbs was the third worst, overall, in the entire nation; only Newark, New Jersey and Cleveland, Ohio ranked worse. The Hartford region had the greatest disparity in the country on the poverty ratio scale—a city/suburb comparison of the relative percentages of families with annual incomes of under 125 per cent of the federal low-income standard for

that family size. Hartford was second worst on the limited education ratio scale—the percentage of the population over age 25 with less than a 12th-grade education. It was also second worst on housing overcrowding, defined as occupancy over one person per room. The City was third worst on both the unemployment and per capita income comparisons. However, it was in the middle-range of American cities in Standard Metropolitan Statistical Areas (SMSA) of over 500,000 population on the dependency ratio scale—the percentage of the population under 18 or over 64 years of age.

These statistics are particularly relevant to the issues raised by this lawsuit. The last factor suggests that there is a pool of working-age persons now living in the City, but the unemployment ratio tells us that the jobs which exist are out in the suburbs. The study also indicates that there is a critical housing shortage in the City, resulting in severe overcrowding. This housing crush could be relieved by a movement to the surrounding towns, perhaps motivated by a search for employment opportunities. This sort of exodus may well have been what Congress anticipated when it established the "expected to reside" category on the Housing Assistance Plan, and emphasized the importance of "planned or existing employment facilities" to the calculations required to estimate this aspect of a town's housing needs for lower-income persons. See Part V *infra.*

The disparities reflected in these figures assume even greater significance when one realizes that Springfield, Massachusetts—another good-sized central city, with its attendant problems, and part of the Hartford SMSA—was included in the "suburban" figures for purposes of this study by The Brookings Institution!

15. Ruling on Defendants' Motions, cited at note 12 *supra.*

*first priority* going to "the same metropolitan area." Thus, the City of Hartford has clearly suffered a judicially cognizable injury, sufficient to confer standing to sue, if the grant applications were approved in a manner contrary to law. It certainly stands to benefit in a tangible way from this court's intervention, thereby meeting the Supreme Court's most recent formulation of the "injury-in-fact" requirement. *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343, 360 (1975).

■ The defendants' challenge to the standing of the city officials and the individual plaintiffs presents other problems. The members of the Court of Common Council sue only in their official capacities. Their claim of standing depends upon their alleged inability to perform their official duties and responsibilities because of the federal government's improper approval of the grant applications.[16] They point out that they have taken an oath to uphold the United States Constitution, and that they challenge HUD's approval on constitutional as well as statutory grounds. From this they conclude that they should be recognized as having standing to sue, citing *Board of Education of Central School District No. 1 v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). However, *Allen* involved constitutional issues, specifically, a constitutional challenge to a state law. The plaintiff officials were torn between their duty to implement the state law and their duty to uphold the federal constitution.[17] Here, by contrast, the city officials are not challenging any allegedly unconstitutional duties placed upon them. Rather, they seek to overturn the actions of the defendant HUD officials, based, in part, on a constitutional challenge. *Allen* does not stand for the proposition that anyone who has once taken, or is currently bound by, an oath to uphold the federal constitution has standing to challenge actions of third parties simply because they are similarly bound. These city officials have no cognizable legal interest in the outcome of this suit. Therefore, the motion to dismiss will be granted with respect to the members of the Court of Common Council of the City of Hartford.

The situation of the two low-income minority plaintiffs is more difficult. The question is whether standing to sue can be fashioned on the basis of these two characteristics. To determine the answer, it is necessary to analyze exactly what is being challenged, and what exactly is the basis of the challenge.

■ The plaintiffs challenge administrative action: HUD's approval of the grants to the seven suburban towns. They allege that this approval was contrary to the department's responsibilities under a battery of federal statutes, chief among them the Housing and Community Development Act of 1974 and Title VIII, the Fair Housing Title, of the 1968 Civil Rights Act. As poor persons living in Hartford in substandard housing,[18] they are certainly within the "zone of interests" created by the 1974 Act. The opening section of that Act is replete with the phrase "principally for persons of low or moderate income," emphasizing whom the Act was intended to benefit. And that same section also highlights the key role housing was to play in Congress' goal of preserving viable urban communities. Furthermore, as members of minority groups, plaintiffs are entitled to the protection of the federal civil rights acts.[19]

The defendants argue that the decision in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) is dispositive of the standing issue, and requires that the individual plaintiffs also be dismissed

16. Plaintiffs' Exhibit 9, Affidavit of Richard Suisman, September 18, 1975, ¶ 32.

17. 392 U.S. at 241 n. 5, 88 S.Ct. 1923.

18. Affidavits of Miriam Jordan and Fannie Mauldin, July 1, 1975.

19. Indeed, even non-minorities have standing to sue under the broad "person aggrieved" standard Congress selected for suits brought under the 1968 Fair Housing Act. *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

for failing to state a claim. But this case is not controlled by *Warth.* There the plaintiffs raised only constitutional challenges to the zoning decisions of local officials. Here statutory claims are also at issue, and, as the Supreme Court noted in *Warth,* "[t]he actual or threatened injury required by Article III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . . .' "[20] In this Circuit the controlling decision is *Evans v. Lynn,* No. 74–1793 (2d Cir. June 2, 1975) *rehearing en banc granted* August 11, 1975. There the plaintiff class consisted of

> "minority residents of Westchester County who reside in racially concentrated areas of the county and are constrained to do so because the failure of federal agencies to perform their affirmative duties permits the maintenance of a growing pattern of racial residential segregation . . ."

*Evans v. Lynn,* Slip Op. 3885, 3888. They challenged the approval, by HUD and the Bureau of Outdoor Recreation, of federal grant moneys to a sewer district within the Town of New Castle, and to the Town itself.[21] The Court of Appeals, in a 2–1 decision, held that the low-income plaintiffs had stated a judicially cognizable claim sufficient to withstand a motion to dismiss for lack of standing. Judge Oakes, writing for the court, held that the plaintiffs were within the "zone of interests" created by Title VIII, in that they challenged federal agency action as, allegedly, not complying with the "affirmative duty" upon federal agencies to administer their programs in a manner designed to enhance fair housing opportunities. In his concurring opinion, Judge Gurfein held that the

plaintiffs had standing under the Administrative Procedure Act,[22] in order "to raise the question of whether the Secretary has failed to make the inquiries" implied by this affirmative duty. *Evans v. Lynn,* Slip. Op. 3885, 3918.

■ The grants in this case were approved by HUD. Although the statute sets forth specific standards by which the grants are to be tested, the plaintiffs allege that they were not correctly implemented by HUD.[23] The statute clearly has, as one of its objectives, the spatial deconcentration of lower-income groups, particularly from the central cities. Congress apparently decided that this was part of the solution to the crisis facing our urban communities. These two plaintiffs are among this very group of persons, persons for whom Congress indicated it might be beneficial to relocate outside the central city.[24] Part of the grant application process involves an assessment by each community of its needs, and the development of a plan to meet those needs. If the needs stated in the application are not a true reflection of the community's needs, or if the projects for which the funds are to be spent are not calculated to meet the community's needs, the Secretary is required to disapprove the grant application. The granting process, as disclosed in the administrative record compiled during the review of these seven grant applications,[25] involved a flexible review by HUD. The applications were studied and commented upon by HUD personnel, who evaluated the needs and projects as set forth in the applications. In many instances, more information was requested from applicants, or their responses were invited to HUD's criticisms or suggestions. In several instances the applicant communities responded to com-

---

**20.** 422 U.S. at 500, 95 S.Ct. at 2206, citing *Linda R. S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

**21.** The programs which authorized those grants have since been consolidated into the unified community development program at issue in this case.

**22.** 5 U.S.C. § 702.

**23.** These standards may be found at 42 U.S.C. § 5304(c) (1975 Supp.).

**24.** 42 U.S.C. § 5301(c)(6) (1975 Supp.).

**25.** The administrative records for all seven grant applications have been incorporated into the record.

ments and criticism from HUD by revising their applications. If approval was improper, the plaintiffs may well have lost the benefits of re-directed priorities by the applicant towns, or, perhaps, the benefits of projects implemented by the City of Hartford with any reallocated funds. Thus, both the "zone of interests" and "injury-in-fact" aspects of standing required by *Warth* are present here. Additionally, as Judge Gurfein noted, the plaintiffs have standing under the APA, as persons aggrieved by agency action, to permit the court to decide what HUD's obligations are, and whether it has met them.

Similarly, Title VIII itself established an affirmative obligation upon HUD, an obligation which doubtless inures to the benefit of these plaintiffs. The extent of this obligation, and the issue of whether or not it was satisfied in this case, are issues which go to the merits.[26] As Judge Oakes pointed out in *Evans*, "it is enough if a viable claim of nonperformance is made." Slip Op. 3885, 3891 n. 8. For the reasons stated in his opinion in that case, I agree that the plaintiffs here possess standing to sue under Title VIII. Here, as there, we have plaintiffs who claim injury from purposeful administrative inaction. Here, as there, the improper approval of grants may perpetuate existing patterns of racial (and economic) segregation. This claim under the 1968 Civil Rights Act distinguishes *Warth v. Seldin,* as noted by Judge Zampano in *Accion Hispana v. Town of New Canaan,* Civ. No. B–312 (D.Conn. August 18, 1975). The plaintiffs have alleged sufficient injury to their protected interests to permit them to bring their claims into court.

## IV.

As has been made clear by the preceding discussion, this case involves the new statutory framework for community development funding adopted by Congress in 1974. Title I of the Housing and Community Development Act of that year consolidated ten categorical grant programs into a single block grant program.[27] A three-year community development plan was required as part of the application, and appropriations were authorized through Fiscal Year 1977. Congress intended to streamline the administration of these federal programs,[28] by minimizing HUD's "front-end" review, substituting annual performance monitoring at the time when the future funding levels of grants to the particular community would be determined.[29] In place of the elaborate administrative review by federal officials which preceded grant approval under the ten programs, the new statute establishes a 75-day period, within which HUD must disapprove the application, or else it is automatically approved.[30] Furthermore, the statute directs HUD to approve the grant unless certain very limited conditions exist: (1) the community's true needs are not reflected in the application; or (2) the proposed projects will not meet the needs described; or (3) the proposal does not comport with other legal requirements.[31]

---

**26.** See Parts IV and V *infra.*

**27.** The new Community Development Program replaced the following ten development programs administered by the Department of Housing and Urban Development: the Public Facilities Loan Program authorized by Title II of the Housing Amendments of 1955; the Open Space Program authorized by Title VII of the Housing Act of 1961; the Planning Advance Program authorized by Sec. 702 of the Housing Act of 1954; the Water-Sewer, Neighborhood Facilities and Advanced Land Acquisition Programs authorized under Title VII of the Housing and Urban Development Act of 1965; the Urban Renewal, Code Enforcement and Neighborhood Development Programs authorized by Title I of the Housing Act of 1949; and the Model Cities Program authorized by Title I of the Demonstration Cities and Metropolitan Development Act of 1966.

**28.** 42 U.S.C. § 5301(b)(3) (1975 Supp.). *See also,* H.R. Rep. No. 93–1114, 93d Cong., 2d Sess. 2, 3 (1974); S.Rep. No. 93–693, 93d Cong., 2d Sess. 48, 49 (1974), U.S.Code Cong. & Admin.News 1974, p. 4273.

**29.** 42 U.S.C. § 5304(d) (1975 Supp.).

**30.** 42 U.S.C. § 5304(f) (1975 Supp.).

**31.** 42 U.S.C. § 5304(c) (1975 Supp.).

The new Act also gave local communities a greater role in determining how to spend their federal funds by requiring citizen participation and expanding the range of eligible activities. All the projects, however, must be directed toward accomplishing the central objective of the legislation:

"the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." [32]

Congress did not leave local communities with merely this broad statement of purpose. Rather, it legislated seven specific goals, thereby establishing national priorities to govern the use of community development funds. The Act also sets forth an extensive list of eligible activities, and requires that HUD disapprove applications for grants for any project not so qualified.[33] Three of the seven specific goals explicitly urge that moneys be spent on behalf of persons of low and moderate income.[34] Two speak directly,[35] and three more indirectly,[36] to the housing needs of that segment of the populace.

The plaintiffs' position is that one of these Congressional goals, in particular, is of great importance in this lawsuit—that concerned with reducing:

"the isolation of income groups within communities and geographical areas

and the promotion of an increase in the diversity and vitality of neighborhoods through the spatial deconcentration of housing opportunities for persons of lower income . . . ." [37]

They argue that this is one of the primary goals of the Act, and that it was to be achieved, at least in part, through another aspect of the Act—the Housing Assistance Plan.[38] The Housing Assistance Plan (HAP), which is to be completed by the applicant community, must contain a survey of the housing stock of the community, an assessment of its housing needs, a goal for the provision of assisted housing, and a description of the location of existing and proposed lower-income housing. The 1974 Act also made the HAP the basis for assistance under many of the federally-subsidized, low-income housing programs.[39] As such, it is an important link between the housing and the community development sections of the Act.[40] The significance of this cannot be overestimated. Congress left no doubt of the pivotal role it intended for the HAP by excluding it from the list of application requirements which might be waived by the Secretary.[41]

The plaintiffs charge that HUD disregarded the statute by approving these grants without requiring the communities to complete one element of the "needs" section of the HAP; that part which requires a community to estimate the housing needs of low income persons

---

32. 42 U.S.C. § 5301(c) (1975 Supp.).

33. 42 U.S.C. § 5305 (1975 Supp.) describes the eligible activities; 42 U.S.C. § 5304(c)(3) (1975 Supp.) requires disapproval of any application that proposes ineligible activities. Clarifying regulations were issued recently. 24 C.F.R. § 570.200 *et seq.;* 41 Fed.Reg. 2765 (January 19, 1976).

34. 42 U.S.C. § 5301(c)(1), (3), (4) (1975 Supp.).

35. 42 U.S.C. § 5301(c)(3) and (6) (1975 Supp.).

36. 42 U.S.C. § 5301(c)(1), (2), (5) (1975 Supp.).

37. 42 U.S.C. § 5301(c)(6) (1975 Supp.).

38. The HAP is described in 42 U.S.C. § 5304(a)(4) (1975 Supp.).

39. Pub.L. No. 93–383 § 213; 42 U.S.C. § 1439 (1975 Supp.). This section virtually insulates a community from unwanted federally-assisted housing projects by permitting it to object to any application for assistance it deems "inconsistent" with its HAP.

40. The newly-proposed HUD Regulations, note 11 *supra,* 24 C.F.R. § 570.303; 41 Fed.Reg. 2347 (January 15, 1976), acknowledge the importance of the HAP, describing it as "one of the most significant parts of the community development application process, [with] . . . a significant impact on various aspects of HUD-assisted housing program activities." *Id.* at 2348.

41. 42 U.S.C. § 5304(b)(3) and (4) (1975 Supp.).

"expected to reside" within its borders.[42] Six of the defendant towns [43] had their grants approved despite their submission of a "zero 'expected to reside' " figure on their applications. The plaintiffs argue that this was not an accurate estimate of the housing needs which existed among persons in this category.[44] This omission, they argue, effectively emasculated the "needs" section of the applications themselves. They further argue that, if what they describe as "needs" had been included, the projects proposed by the towns would then have been inappropriate to the "needs" disclosed for the community. If either of these are true, they contend, the Secretary would have been mandated to disapprove the applications, under § 5304(c)(1) and (2). Finally, they also contend that HUD's approval of these grants, despite the towns' failure

to make a realistic projection of the influx of new low-income residents, is contrary to the "legal review" duties imposed upon the Secretary by § 5304(c)(3). This is the source of their claims under the federal civil rights acts; it is also the basis of their claim that HUD has not even complied with the 1974 Act itself.

HUD's failure to require an accurate projection of low-to-moderate income persons expected to reside in the communities was not the result of an oversight. On May 21, 1975, while six of the seven communities' applications were still in the process of HUD review, the HUD Area Office received a memorandum from David O. Meeker, Jr., Assistant Secretary for Community Planning and Development at HUD.[45] That memoran-

---

**42.** 42 U.S.C. § 5304(a)(4)(A) (1975 Supp.). This information is to be given in Table II C of the applicant's Housing Assistance Plan.

**43.** All but East Hartford.

**44.** HUD's regulations state that this figure refers to lower income persons and families "planning or expected to reside in the community as a result of planned or existing employment facilities." 24 C.F.R. § 570.303(b)(2). The plaintiffs offer, as examples of why they question the accuracy of a "zero" figure for any of the defendant towns, the fact that 4,600 Hartford residents commute to work in East Hartford, and that 6,980 more work in West Hartford. Testimony of Jonathan Colman, September 22, 1975. These figures were from a study prepared by HARCON Associates, for the City of Hartford, based on information from the Connecticut Department of Labor. Furthermore, a study conducted in Glastonbury identified 806 persons working in the Town who resided elsewhere, but wanted to live in Glastonbury, and were eligible for federal housing assistance under the Section 8 program established by the 1974 Act.

As Mr. Paul Davidoff, a lawyer and urban planner who served as a consultant to the City of Hartford in its review of the defendant towns' grant applications, testified:

"At the end, a judgment had to be made. . . . [A] community might have made, for the first year, a tentative judgment. It might have been wrong. . . . But it isn't zero, because the zero figure is patently absurd in terms of the reality of what is happening in each of these communities. There is no basis at all, in fact, in any of the data on the growth of these communities . . . for zero to be put in."

Hearing of September 23, 1975.

**45.** This memorandum, sent to all area office directors and all community planning and development division directors, was added to the record as Plaintiffs' Exhibit 12, at trial, and as Exhibit B to the Affidavit of Lawrence Thompson, August 25, 1975. Mr. Thompson is Director of the Hartford Area Office of HUD. The memorandum provides, in pertinent part, that:

"Where, in the opinion of the reviewer, it is reasonable to assume that a significant portion of the potential need has not been included in the needs table of the HAP, the applicant should be contacted indicating that prior to HUD's tender of contract the applicant must:

(a) Adopt the HUD figure . . . ., or

(b) Adopt its own figure . . . ., or

(c) Indicate what steps the applicant intends to take in identify [sic] a more appropriate needs figure by the time of its second year submission."

The plaintiffs do not challenge the procedural propriety and legal effect of the May 21, 1975 Meeker Memorandum. Paraphrasing the analogous decision in *Fletcher v. Housing Authority of Louisville,* 491 F.2d 793, 799 n. 10 (6th Cir.), *vacated and remanded,* 419 U.S. 812, 95 S.Ct. 27, 42 L.Ed.2d 39 (1974), it is HUD's decision to implement the memorandum, and not its issuance, which is involved here. Offering the options presented by the Meeker Memorandum to the six defendant towns is what the plaintiffs complain about, not the compliance by HUD with rule-making procedures before it issued the memo.

The degree of control exercised over the entire community development funding process by the HUD central office, in Washington, D.C., is illustrated by an excerpt from an earlier HUD directive, also issued by Mr. Meeker.

dum informed the communities that they would be permitted to obtain approval of their first year grant applications, even without submitting figures in the "expected to reside" category. Two other approaches, involving estimates of this need, were suggested in this memorandum, but the option of whether to adopt them, or not to submit any figure, was given to each applicant community.[46] Mr. Thompson testified that the Meeker Memorandum was issued in response to "the difficulty all communities across the country were having on this 'expected to reside' element." The local HUD office approved these six grants pursuant to that directive. Thus, neither the towns nor the Area Office are entirely at fault.

The plaintiffs challenge this HUD directive, characterizing it as a *de facto* waiver of the "expected to reside" element of the Housing Assistance Plan, contrary to the non-waiver provision of the 1974 Act. The government argues that this was simply a deferral of that element, and well within HUD's authority in administering the Act.

 Of course, deference is due to the construction of a statute by the administrative department responsible for its implementation. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). But this "sound principle . . normally applies only where the relevant statutory language is unclear or susceptible of differing interpretations." *Shea v. Vialpando,* 416 U.S. 251, 262 n. 11, 94 S.Ct. 1746, 1754, 40 L.Ed.2d 120 (1974). Thus, if the statute gives specific directions, *Koshland v. Helvering,* 298 U.S. 441, 447, 56 S.Ct. 767, 80 L.Ed. 1268 (1936), or the administrative interpreta-

tion is not consistent with either the statute, *Morton v. Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), or Congressional intent, *Espinoza v. Farah Manufacturing Co.,* 414 U.S. 86, 94, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), the administrative agency cannot amend it by regulation. *Koshland v. Helvering,* 298 U.S. 441, 447, 56 S.Ct. 767, 80 L.Ed. 1268 (1936). This salutary rule is to be applied by the courts to prevent "the unauthorized assumption by an agency of major policy decisions properly made by Congress." *American Ship Building v. Labor Board,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965). Although "[t]he court is not empowered to substitute its judgment for that of the agency" on matters of fact, *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971),

> "the courts are the final authorities on issues of statutory construction, . . and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'"

*Volkswagenwerk v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968) (citations omitted). As the Supreme Court stated in *Manhattan Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936):

> "The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can be delegated by Congress—but the

Meeker Memorandum of November 29, 1974. Exhibit A to Affidavit of Lawrence Thompson, August 25, 1975. This earlier memorandum directs that:

> "No CD programs may be approved, even conditionally, without approval of the HAP. Therefore, disapproval of the HAP amounts to disapproval of the whole CD program. Since CD plan disapproval can only be made at the Central Office, Area Offices finding a HAP unacceptable must follow the disapproval procedure described below. . . .

The power to disapprove applications for entitlement funds is not delegated below my office."

**46.** In letters sent out from the Community Planning and Development Division of the Area Office on June 2, 1975, to each of these six applicant communities. Because the local HUD Area Office was unable to develop its own "expected to reside" figures, only the second and third options of the Meeker Memorandum were presented to these towns.

power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity."

Undaunted by these principles of law, HUD contends that the Meeker Memorandum was not in conflict with the statute, but merely supplementary to it. However, the statute could not be more clear. The Secretary was permitted to waive all or part of paragraphs (1), (2), and (3) of 42 U.S.C. § 5304(a), under certain conditions. And the Secretary was also permitted to accept the applicant community's certification that it had complied with paragraphs (5) and (6). Only paragraph (4), that describing and requiring the HAP, is not mentioned. The canon of construction *inclusio unius est exclusio alterius* compels the conclusion that the Secretary was not empowered to waive the requirement that the application include a Housing Assistance Plan for the community. Such a creation of additional exceptions to statutory requirements, by adminis-

trative action, is not favored. *Carey v. Local Board No. 2, Hartford, Connecticut,* 297 F.Supp. 252, 260 (D.Conn.), aff'd, 412 F.2d 71 (2d Cir. 1969).[47]

The defendants correctly observe that HUD has not waived the entire HAP, but merely one of the elements that go into the community's assessment of its needs for lower-income housing.[48] The failure to submit a figure for the "expected to reside" category does not detract, for example, from each town's calculation of the housing needs of its present inhabitants who fall within the lower-income classification.[49] However, the "expected to reside" figure is the keystone to the *spatial deconcentration objective* of the 1974 Act.[50] The recent report issued by the United States Commission on Civil Rights[51] emphasizes that the Housing and Community Development Act of 1974 envisions a new direction in federal assistance programs because it:

"for the first time ties the provision of community development funds to the provision of lower-income housing by

| Farmington: | $13,712 |
| Glastonbury: | $15,000 * |
| Vernon: | $12,338 |
| West Hartford: | $14,796 * |
| Windsor Locks: | $13,372 |

At the hearing of September 22, 1975, Mr. Colman testified as to the substantially lower 1970 Census median income figures for these towns. He further testified that even the 1972 figures quoted above had risen considerably by 1975.

\* The base year for these two figures is not clear from the Affidavit.

---

**47.** *See also, Marsano v. Laird,* 412 F.2d 65 (2d Cir. 1969).

**48.** As Mr. Lawrence Thompson testified at the hearing: "The Housing Assistance Plan requirement is a statutory provision and it's way beyond my power to waive it. Only the Congress could." Hearing of September 24, 1975.

**49.** HUD Regulations equate the terms "lower" and "low and moderate" income families, and define this group as those

"families whose annual incomes do not exceed 80 percent of the median family income of the area as determined by the Secretary with adjustments for smaller and larger families . . . ."

24 C.F.R. § 570.3(*o*). The maximum annual income for these groups, during 1975 in the Hartford area, was $7,500 for low and $12,000 for moderate income families, depending on family size. Plaintiffs' Exhibit 10, Affidavit of William Slitt, September 16, 1975, ¶ 5.

The 1972 median incomes for the seven defendant towns, as set forth in the Affidavit of Jonathan Colman, July 29, 1975, Exhibit A to Plaintiffs' Memorandum in Support of Motion for A Preliminary Injunction, are as follows:

| East Hartford: | $12,000 |
| Enfield: | $12,789 |

**50.** Testimony of Paul Davidoff, September 23, 1975. Mr. Thompson of HUD also agreed that the "expected to reside" figure is "an important requirement," and is "the only specific element of the Act that I can identify that operationally connects [the spatial deconcentration of lower-income persons] with what we do and the applicants do." Hearing of September 24, 1975.

**51.** *Twenty Years After Brown: Equal Opportunity In Housing,* United States Commission on Civil Rights (December, 1975).

requiring each locality to submit a housing assistance plan as part of its community development block grant application. To receive *community development funding*, a locality must address its need for lower-income housing." (Emphasis added).[52]

The success of this new "carrot and stick" approach to the dispersal of low and moderate income groups depends upon the willingness of the suburban towns to provide federally-assisted housing within their boundaries. Of course, communities can choose not to participate in the program.[53] However, the Meeker Memorandum permits suburban towns to obtain funding under the Act without the *quid pro quo* Congress decided to require—their taking steps to expand housing opportunities for low and moderate income persons. Indeed, this requirement is one of the most important differences between the Housing and Community Development Act of 1974 and the categorical grant community development programs it replaced.[54] Thus, the Meeker Memorandum removes the incentive Congress provided for these communities to accept such federally-assisted housing, thereby effectively gutting the "enforcement" provisions of the Act.[55]

▆▆▆▆ I conclude that HUD acted contrary to law when it approved these six grants, without requiring the towns

to make any assessment whatsoever of the housing needs of low and moderate income persons who might be "expected to reside" within their borders. When HUD offered the towns the third option presented by the May 21, 1975 Meeker Memorandum, to submit no figure at all, and they all selected that option, they acted contrary to the clear implication of the statute, that the HAP could not be waived by the Secretary.[56] The preliminary injunction previously entered in this case will be made permanent with respect to the Towns of Enfield, Farmington, Glastonbury, Vernon, West Hartford, and Windsor Locks.

### V.

The grant to the Town of East Hartford presents a somewhat different problem. Unlike the other defendant towns, East Hartford actually submitted a figure for the "expected to reside" portion of its HAP. The original HAP disclosed a total need for 135 assisted units in this category, including 81 elderly or handicapped, 16 large families, and 38 others. These figures were subsequently reduced, to 131, 78, 15, and 38, respectively, in a revision of the HAP undertaken at HUD's request.

The plaintiffs contend that these figures understated the actual number of lower income persons who should have been "expected to reside" in East Hartford, based on the facts and data availa-

---

**52.** *Id.* at 32.

**53.** As have both Berwyn and Cicero, Illinois *Id.* at 61 n. 191. Indeed, the Town of Vernon applied for only $25,000 to build a residential park, although its first-year entitlement grant, under the statutory "hold harmless" formula, was over $100,000. 42 U.S.C. § 5306. Testimony of Jonathan Colman, September 23, 1975. The Town has since obtained a discretionary grant under the Act in the amount of $150,000. Letter of January 7, 1976, to the court, from Martin B. Burke, Town Attorney.

**54.** *Twenty Years After Brown: Equal Opportunity In Housing*, United States Commission on Civil Rights (December, 1975) at 60.

**55.** The newly-proposed HUD Regulations, see note 11 *supra*, suggest that HUD is contemplating a partial waiver for yet another year, in certain circumstances. 24 C.F.R. § 570.-

303(c)(2)(vi); 41 Fed.Reg. 2347, 2349 (January 15, 1975). As stated in note 11 *supra*, the validity of this proposed regulation is not, however, before me in this case.

**56.** This decision avoids any need to assess the propriety of HUD's conclusion that the needs, as described in these six towns' applications, were not "plainly inconsistent" with "significant facts and data, generally available and pertaining to community and housing needs and objectives," and that the proposed projects were not "plainly inappropriate to meeting the needs and objectives identified by the applicant," as required by 42 U.S.C. § 5304(c)(1) and (2) (1975 Supp.). Those issues are, however, addressed with respect to the East Hartford application, in Part V *infra* of this opinion.

ble at that time. They argue from this that the Secretary acted contrary to law because she was obligated to disapprove the East Hartford grant application, since the "expected to reside" figures were "plainly inconsistent" with the facts and data. 42 U.S.C. § 5304(c)(1) (1975 Supp.).

The issues presented for decision are whether the Secretary's approval of this grant was: (1) within the scope of her authority; and (2) neither arbitrary nor capricious. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414–16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The answers to these questions

> "require the reviewing court to engage in a substantial inquiry. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." [57]

■ Here the answer to the first question is simple. Congress dictated that the grants be approved, unless the Secretary made certain determinations. HUD established review procedures which delegated the power to approve applications to the Area Directors, but retained the power to disapprove in Washington.[58] The administrative record discloses that these determinations were not made with respect to the East Hartford application. On the contrary, the Hartford Area Office did "not consider the information submitted by the City of Hartford as 'facts and data,'"[59] and so concluded that conditional approval was warranted.[60] The decision to approve the grant was certainly within the "range of choices that the Secretary can make." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

■ The second inquiry, however, presents more difficulty. The statute [61] requires me to determine, in essence, "whether the decision [to approve the grant] was based on a consideration of the relevant factors and whether there has been a clear error of judgment." 401 U.S. at 416, 91 S.Ct. at 824. I conclude that the Secretary has abused her discretion in both respects. HUD's approval, without taking the steps required to obtain the "generally available" information it needed to evaluate these applications, and without considering such information, amounts to arbitrary and capricious decision-making. Furthermore, the decision to approve the East Hartford application, in the face of this "generally available" information, constituted a clear error of judgment, and was not in accordance with law. In other words, HUD was doubly at fault—it did not obtain the generally available information required for a proper review, and it acted upon the basis of inadequate information.

HUD does not claim that it was able to critically appraise the "expected to

---

**57.** 401 U.S. at 415–16, 91 S.Ct. at 823. The cautionary instruction concerning the narrow scope of review is particularly appropriate in this case, since the Secretary herself has been given only a very limited range of discretion. 42 U.S.C. § 5304(c) (1975 Supp.). Congress clearly built a presumption of approval into the Act with this restrictive review standard and the automatic approval provision. 42 U.S.C. § 5304(f) (1975 Supp.).

**58.** Meeker Memorandum of November 29, 1974. Exhibit A to the Affidavit of Lawrence Thompson, August 25, 1975.

**59.** Memorandum to the East Hartford Entitlement File, May 19, 1975. Attachment J to the Administrative Record for East Hartford.

**60.** Memorandum to Lawrence Thompson, April 24, 1975. Attachment O to the Administrative Record for East Hartford. The grant approval letter, dated May 2, 1975, is Attachment L to the Administrative Record.

**61.** 5 U.S.C. § 706 provides:

"The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

reside" figures in the East Hartford application. Mr. Lawrence Thompson, the Hartford Area Director, admitted that:

> "In reviewing the HAPs, it was apparent that there was an absence of reliable data upon which to evaluate the surveys of housing needs of lower-income groups expected to reside in the community as a result of planned or existing employment facilities."[62]

As a result, HUD was unable to calculate its own estimate of "expected to reside" figures, or even "to make a determination as to the accuracy of the figures supplied by the defendant towns."[63]

Mr. Thompson suggested that more data was not gathered because, in the time that would have taken, the 75-day review period would have been exceeded, and the grants would have been automatically approved.[64] He acknowledged that all the local communities were having great difficulty in developing "expected to reside" figures, and that this caused him to suspend processing of all pending applications during May 1975, to await expected instructions from HUD in Washington, D. C.[65] These instructions came in the Meeker Memorandum of May 21, 1975, discussed in Part IV of this opinion. That memorandum set forth a methodology, developed by the central office, for computing an "expected to reside" figure for a community, based on the U. S. Census Bureau's "Journey to Work" tables.[66] It was the apparent unavailability of these figures on a municipality-by-municipality basis for the Hartford SMSA that led the Area Office to conclude that it was unable to prepare its own "expected to reside" figures, or to review those proposed by East Hartford.[67] However, a similar breakdown, lacking only income figures for the commuters, proved to be available from the Connecticut Department of Transportation, on only two days' notice![68]

Mr. Thompson also stated that East Hartford was not given the opportunity to submit a "zero" as its "expected to reside" projection, as were the other six defendant towns,[69] only because its application was approved before processing was suspended.[70] Thus, it was simply

---

**62.** Affidavit of Lawrence Thompson, August 25, 1975, ¶ 12.

**63.** Affidavit of William Flood, September 12, 1975, ¶ 5. Exhibit B to the Defendants' Memorandum in Support of Motion to Dismiss or in the Alternative for Summary Judgment. Mr. Lawrence Thompson testified to the same effect at trial, stating that HUD lacked the data necessary "to compute a substitute figure to the figure that was supplied by the applicant." Hearing of September 23, 1975.

**64.** Pursuant to 42 U.S.C. § 5304(f) (1975 Supp.). Affidavit of Lawrence Thompson, August 25, 1975, ¶ 13. The East Hartford application was received by HUD on March 24, 1975. Supplemental Affidavit of Lawrence Thompson, September 12, 1975, ¶ 19. Exhibit A to the Defendants' Memorandum in Support of Motion to Dismiss or in the Alternative for Summary Judgment. The application was approved in a letter from Mr. Thompson, dated May 2, 1975. Attachment L to the Administrative Record for East Hartford. Thus, approximately five weeks still remained on the "75-day clock" at the time the East Hartford application was approved.

**65.** Supplemental Affidavit of Lawrence Thompson, September 12, 1975, ¶ 7. This problem was not limited to the Greater Hartford Area. Affidavit of Allan Thornton, November 6, 1975, ¶ 4.

**66.** Meeker Memorandum of May 21, 1975. Plaintiffs' Exhibit 12 and Exhibit B to the Affidavit of Lawrence Thompson, August 25, 1975.

**67.** Affidavit of William Flood, September 12, 1975, ¶ 4.

**68.** Affidavit of Paul Davidoff, October 21, 1975, ¶ 9, and Affidavit of Jonathan Colman, October 22, 1975, ¶ 3.

**69.** In letters sent out by the HUD Area Office on June 2, 1975. Affidavit of William Flood, September 12, 1975, ¶ 8.

**70.** Supplemental Affidavit of Lawrence Thompson, September 12, 1975, ¶ 22. Indeed, East Hartford received a similar letter on June 5, 1975. Affidavit of William Flood, September 12, 1975, ¶ 9. Attachment M to the Administrative Record of East Hartford. This letter emphasized the importance of the "expected to reside" element of the HAP, informed the Town of the options the Hartford Area Office had extended to the other communities, and stated that East Hartford, while not required to alter its HAP at that time, would be required to address this need at the time of its

happenstance that a figure for "expected to reside" was included in the East Hartford HAP at all. The record demonstrates that, so far as HUD was concerned, that number might have had no validity whatsoever—it was untested and untestable. HUD's approval of the grant to East Hartford in such circumstances cannot be considered a proper exercise of discretion. Rather, it was an abandonment of its duty to review and evaluate the housing needs projection for those persons "expected to reside" within East Hartford. I conclude that HUD's approval of East Hartford's grant application was contrary to law.

There is no doubt that HUD did not conduct a rigorous review of the East Hartford "expected to reside" projection. It justified this failure by pointing to an alleged absence of data. In fact, however, a wide variety of alternative data sources was available. For example, HUD's own instructions suggest the use of census materials; code enforcement records; local agency records; 701 plans; or studies done by reputable research, community service, or planning organizations, such as private consulting firms.[71] The proposed HUD Regulations also list several data sources, such as approved development plans; building permits; and major contract awards.[72] One of the plaintiffs' expert witnesses, Mr. Paul Davidoff, also listed a number of other possibilities, including studies conducted by or for state agencies; plant or shopping center surveys; zip code information from the payroll records of local companies; or data gathered by the local chamber of commerce.[73] And Mr. Jonathan Colman, Director of Planning for the City of Hartford, testified that figures detailing commercial development, in the form of floor space completed or under construction, are compiled by the Connecticut Department of Commerce.[74] The HUD Regulations[75] and instruction sheet[76] do not require that the data used to review grant applications be published. The standard is simply that it be "accessible . . . or . . . available to both the applicant and the Secretary . . . ."[77] The materials and data sources described above fall within this broad category, and HUD's failure to gather and consult them prior to its evaluation of East Hartford's grant[78] was an abdication of its responsibilities under the Housing and Community Development Act of 1974.[79]

The foregoing discussion is not intended to suggest that East Hartford invented its 135, then 131, figures, or that HUD's review of the East Hartford application was entirely passive. East Hartford developed its "expected to reside" projection from the waiting list for the East Hartford Housing Authority,[80] and the HUD Area Economist, William Flood, commented upon the unsatisfac-

---

next submission, in accordance with HUD regulations.

**71.** Instructions For Form HUD–7015.8 thru 11. Plaintiffs' Exhibit 2 at trial.

**72.** 24 C.F.R. § 570.303(c)(2)(i)(A); 41 Fed.Reg. 2347, 2349 (January 15, 1976).

**73.** Testimony at the Hearing of September 23, 1975.

**74.** Testimony at the Hearing of September 22, 1975. These figures can be used to estimate new employment opportunities generated by that construction. HUD's awareness of the relationship between new commercial construction and new employment opportunities is demonstrated by Plaintiffs' Exhibit 14, a letter to Stephen Fils, Town Manager of Farmington, from Lawrence Thompson, March 9, 1972.

**75.** 24 C.F.R. § 570.306(b)(2).

**76.** Plaintiffs' Exhibit 2, note 71 *supra*.

**77.** 24 C.F.R. § 570.306(b)(2).

**78.** It is clear from the record that HUD's review was not based on this sort of data. "I chose to approve these seven applications after determining they were not plainly inconsistent with the facts and data avaiiable [*sic*] at that time." Affidavit of Lawrence Thompson, August 25, 1975, ¶ 14. Also, see Affidavit of William Flood, September 12, 1975, ¶ 5.

**79.** 42 U.S.C. § 5304(c)(1) (1975 Supp.).

**80.** Attachments D and K to the Administrative Record for East Hartford. The Town used the 40 per cent of the applicant pool who were not residents of East Hartford as its "expected to reside" estimate.

tory nature of that methodology.[81] The Hartford Area Office itself

> "agreed [with the City of Hartford] that a more comprehensive approach should be reflected in future HAPs. [But] HAO considered that using the waiting list *and 1970 census data* provided a satisfactory initial estimate of housing need in the absence of significant regional data . . . ." (Emphasis added).[82]

 Even if it could be said that HUD adopted that waiting list as the data source for computing an "expected to reside" figure, and used it to review the East Hartford application, the approval of the grant on that basis constituted an abuse of discretion. The waiting list, alone, was clearly insufficient as a data base. Mr. Flood acknowledged this when he indicated that the first HAP submitted by East Hartford, using only the Housing Authority waiting list, was "clearly inconsistent with generally available data."[83] The revised HAP, which he found "marginally adequate" and "quite marginal," was based on the 1970 U. S. Census figures for low income persons in East Hartford, as supplemented by the Housing Authority waiting list information. That HAP raised the "currently existing need" figure from 331 to 473, increased the first and third year goals by 60 units,[84] and shifted the emphasis *toward a closer balance between* elderly and non-elderly housing.[85] However, no change was made in the data base from which the "expected to reside" element of the HAP was calculated, and

that figure was actually reduced in the revised HAP![86]

The objections Mr. Flood made to the use of the waiting list alone to estimate currently existing need apply with equal, if not greater, force to its use as the sole source for the "expected to reside" figures. For example, he pointed out that Section 8 subsidies are available to many families with incomes higher than the limits set for public housing, and that there are only a small number of units for large families in the existing inventory of the East Hartford Housing Authority. He also objected to the stale nature of the waiting list data, and the poor reputation of the housing authority.[87] The comments from Education/Instruccion, a local civil rights research organization dealing with discrimination in housing and employment, parallel those made by Mr. Flood. They also point out that the availability of housing through the East Hartford Housing Authority was not publicized outside of East Hartford itself.[88] The Town itself acknowledged the validity of the criticism concerning the shortage of large-family units when it allocated a disproportionate share of its Section 8 funds to meet the needs of large families.[89]

 The waiting list for the East Hartford Housing Authority may well be one factor upon which to base the "expected to reside" projection, but it cannot properly be the only one. The passivity with which HUD reviewed this element of the East Hartford HAP is well

---

81. Memorandum to Harry Reese, April 18, 1975. Attachment O to the Administrative Record for East Hartford.

82. Memorandum to the East Hartford Entitlement File, May 15, 1975. Attachment J to the Administrative Record for East Hartford.

83. Memorandum to Harry Reese, April 14, 1975. Attachment O to the Administrative Record for East Hartford.

84. The increase consisted entirely of an allocation of $120,000 of Section 8 funds. All 60 units were to be in already existing housing.

85. Attachments D and K to the Administrative Record for East Hartford.

86. *Id.*

87. Memorandum to Harry Reese, April 14, 1975. Attachment O to the Administrative Record for East Hartford.

88. Letter to Ms. Connell, Chairwoman of the Ad Hoc Committee on the Housing and Community Development Act, Capitol Region Council of Governments. Attachment H to the Administrative Record for East Hartford.

89. Attachment K to the Administrative Record for East Hartford.

illustrated by the statement, made in comparing the criticisms of the application to East Hartford's response, that:

"The inclusion of these figures [131] in the HAP appears to respond to the explicit comment of 'no reflection of needs' [of those presently working in East Hartford] made by Hartford. CROG's comment on this matter is also answered by the computation listed above."[90]

HUD had a duty to do more than accept any "expected to reside" figure proposed by East Hartford, however inadequate its size or derivation.[91] The administrative record discloses that it did not live up to that duty.

## VI.

For the reasons outlined in the foregoing opinion, I have concluded that the Secretary abused her discretion in approving the community development entitlement grants to the seven defendant communities. The preliminary injunction previously entered in this case is hereby made permanent. The seven defendant Towns are enjoined from drawing upon the Treasury, or spending in any fashion, the entitlement funds granted to them pursuant to Title I of the Housing and Community Development Act of 1974, which are the subject of this lawsuit. The Towns may seek to obtain a new approval of these grant applications from HUD. This injunction may be lifted upon the filing with the court of such a new approval.

It is

So ordered.

---

90. Memorandum to the East Hartford Entitlement File, May 15, 1975. Attachment J to the Administrative Record for East Hartford.

91. HUD's Acting Regional Administrator, Harold Thompson, emphasized this duty in a memorandum to the Area Director, Lawrence Thompson:

"In sum, these allegations [by the City of Hartford] are, in our opinion, well-documented and of a very serious nature. Therefore, whatever your decision may be regarding this matter, please ensure that the administrative file reflects a reasonable decision-making process."

Plaintiffs' Exhibit 13, Memorandum to Lawrence Thompson, April 29, 1975.