Carol ANGELL et al.

v.

Carl A. ZINSSER et al.

Civ. No. H-79-229.

United States District Court,
D. Connecticut.

May 17, 1979.

Raymond R. Norko, Legal Aid Society of Hartford County, Hartford, Conn., Dennis J. O'Brien, Connecticut Legal Services, Inc., Willimantic, Conn., Diana Johnston, Connecticut Legal Services, Inc., Stamford, Conn., for plaintiffs.

Thomas Prior, David Barry, Manchester, Conn., William Shea, Hartford, Conn., for defendants.

## RULING ON MOTION FOR PRELIMINARY INJUNCTION AND MOTION TO DISMISS

BLUMENFELD, District Judge.

The question presented by this motion is whether the government of the Town of Manchester, supported by a referendum vote, can choose to withdraw its application for an additional year's participation in a federally-funded community development block grant program, if the decision to do so was made for the purpose of maintaining racially discriminatory housing conditions in the Town.

I am asked to preliminarily enjoin the Town of Manchester from withdrawing its application for a Fifth Year Community Development Block Grant pending a full hearing on the merits of plaintiffs' claim that the decision to withdraw was made in order to perpetuate racially discriminatory housing conditions in the Town.

## I. FACTUAL BACKGROUND

The Town of Manchester is a suburban town of slightly more than 50,000 residents within 15 minutes' commuting distance from the City of Hartford, Connecticut. Like many suburban towns located in metropolitan areas in the United States, its population is more than 98% white, while the core city to which it relates, Hartford, is more than 30% black and Hispanic. Its governing body is a nine-member council called the Board of Directors, all of whom are defendants here, which is elected from the Town at large for terms of two years.

Manchester has continuously participated in a federal grant program administered by the Department of Housing and Urban Development (HUD) known as the Community Development Block Grant (CDBG) program since the program's inception shortly after the enactment by Congress of the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301–5319 (the Act).[1] Because its population exceeds 50,000 people and it

---

1. The Act has been described as follows:

"The Housing and Community Development Act of 1974 speaks directly to the problems confronting our urban areas. The initial clauses of the statute read:

'(a) The Congress finds and declares that the Nation's cities, towns, and smaller urban communities face critical social, economic, and environmental problems arising in significant measure from—

(1) the growth of population in metropolitan and other urban areas, and the concentration of persons of lower income in central cities; and

(2) inadequate public and private investment and reinvestment in housing and other physical facilities, and related public and social services, resulting in the growth and persistence of urban slums and blight and the marked deterioration of the quality of the urban environment.

'(b) The Congress further finds and declares that the future welfare of the Nation and the well-being of its citizens depend on the establishment and maintenance of viable urban communities as social, economic, and political entities . . . .

'(c) The primary objective of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income.' "

is within the metropolitan area of Hartford, Manchester is considered by HUD to be a "metropolitan city" for purposes of the CDBG program.[2] As a "metropolitan city" it is statutorily entitled to receive a pre-determined amount-certain of CDBG funds each year upon filing an application which complies with federal laws and regulations.[3]

During the first four years of the CDBG program, Manchester applied for and received approximately $1.5 million in funds, which it spent principally for the benefit of lower-income residents. During the fifth year of the program, 1979–1980, Manchester is entitled to receive approximately $500,000 in CDBG funds.

The controversy which is the subject matter of this law suit began to develop in late May 1978, when HUD's Hartford Area Office, after review of Manchester's Fourth Year CDBG Application and Third Year Annual Performance Report, informed the Town that it had "not taken the necessary steps to abide by the Title VIII [Fair Housing[4]] Assurances which [are] an integral part of the CDBG application . . . [and had] not made significant progress in achieving HAP [Housing Assistance Plan[5]] goals for . . . family households who are in need of housing assistance." (Letter of Daniel P. Koselar, Director of Community Planning and Development Division,

*City of Hartford v. Hills,* 408 F.Supp. 889, 893 (D.Conn.1976), *rev'd on other grounds sub nom. City of Hartford v. Towns of Glastonbury,* 561 F.2d 1032 (2d Cir. 1977) (en banc) (6–4), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 766, 54 L.Ed.2d 781 (1978). *See* 42 U.S.C. § 5301.

**2.** 42 U.S.C. § 5302(a)(4)(B).

**3.** 42 U.S.C. § 5304(c); § 5306(a) and (b). *See also* 24 C.F.R. § 570.101; § 570.102.

**4.** The "Title VIII" assurance in the Town's first four applications for the block grant program reads as follows: "The applicant hereby assures and certifies that . . . [i]t will comply with . . . (2) Title VIII of the Civil Rights Act of 1968 [42 U.S.C. §§ 3601–3631], administering all programs and activities relating to housing and community development in a manner to affirmatively further fair housing . . . ."

Title VIII declared it to be "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. "[T]he . . . law was designed to replace the ghettos 'by truly integrated and balanced living patterns.'" *Otero v. New York City Housing Authority,* 484 F.2d 1122, 1134 (2d Cir. 1973), quoting Senator Mondale, the drafter of the bill, 114 Cong.Rec. 3422.

**5.** A HAP or Housing Assistance Plan, is the mechanism which a community receiving CDBG funds uses to achieve the stated purpose of the Act of providing a suitable living environment for low-income persons. The functions of a HAP have been described as follows:
"The Housing Assistance Plan (HAP), which is to be completed by the applicant community, must contain a survey of the housing stock of the community, an assessment of its housing needs, a goal for the provision of assisted housing, and a description of the location of existing and proposed lower-in-

come housing. The 1974 Act also made the HAP the basis for assistance under many of the federally-subsidized, low-income housing programs. As such, it is an important link between the housing and the community development sections of the Act. The significance of this cannot be over-estimated. Congress left no doubt of the pivotal role it intended for the HAP by excluding it from the list of application requirements which might be waived by the Secretary."
*City of Hartford v. Hills, supra,* 408 F.Supp. at 898 (footnotes omitted). *See also* 42 U.S.C. § 5304(a)(4). HUD itself has described the purposes of the HAP as follows:
"The HAP must propose general locations for assisted housing which promote greater choice of housing opportunities and avoid undue concentrations of assisted persons in areas containing a high proportion of lower-income persons, and which further fair housing and assure the availability of public facilities and services adequate to support housing facilities. In addition, all communities are expected to share in providing expanded housing opportunities for lower-income persons and to participate in areawide solutions of housing problems through promotion of spatial deconcentration of housing opportunities for lower income persons.

. . . The HAP offers applicants a means to implement strategies to conserve and expand its housing stock in order to provide a decent home in a suitable living environment for all persons, but principally those of lower income. The HAP should facilitate the reduction of the isolation of income groups within communities and geographic areas, affirmatively further fair housing and promote the diversity and vitality of neighborhoods."
24 C.F.R. § 570.306(1) and (2).

Hartford Area Office, HUD, to Robert B. Weiss, General Manager, Town of Manchester, May 26, 1978.) At the same time HUD requested that an outline of the corrective actions the Town would undertake to remedy these deficiencies be submitted to the Area Office.

In response to this and other actions by HUD, Town officials took actions to conform to the fair housing objectives of the Act. They incorporated in their Fifth Year application a HAP more extensively committed to the expansion of low-income housing opportunities in Manchester, through CDBG-funded building code enforcement and CDBG-funded rehabilitation of existing dilapidated housing. Also, in August 1978, Manchester established a Fair Housing Office and hired a former State Senator and civil rights activist, one Wilber G. Smith, to serve as its Fair Housing Coordinator. Smith, who is black, shortly thereafter prepared and published a brochure designed to encourage minorities and lower income people to settle in Manchester. Several thousand copies of the brochure were printed and distribution was made.

Following these activities of the Town government and its fair housing coordinator, citizens of Manchester voiced objections to the continuation of the CDBG program; and wide newspaper publicity was given to the formation of a white citizens group called the Concerned Citizens for Manchester's Development and its circulation of a petition in an effort to compel the Town to hold a referendum at which the question of Manchester's continued participation in the CDBG program would be determined.[6] The circulation of the petition triggered a heated public controversy among the residents of Manchester concerning, among other things, the alleged racist motives of the Concerned Citizens group and the independence of the Town from undue interference by agencies of the federal government.

In mid-January of 1979, the petition was filed with the Town Clerk and, subsequently, a special referendum was scheduled. Meanwhile, in February 1979, the Board of Directors, by a vote of six to three, decided to file an application with HUD seeking Fifth Year CDBG entitlement funds in the approximate amount of half a million dollars. On April 12, 1979, an application for Fifth Year funds was filed with HUD by Town officials. The application called for the funding of eleven different community development projects, most of which were intended principally to benefit lower-income people and some of which would be effective to alleviate racially exclusionary housing in the Town.

On April 17, 1979, the referendum was held, and by a vote of approximately three to one, an ordinance barring Manchester's participation in the CDBG program for two years was passed. Under the terms of the Town's Charter, § 3–10, the ordinance became "effective on the tenth day after such special election," i. e., April 27, 1979.

On April 18, 1979, the plaintiffs, white low-income residents of Manchester, filed this lawsuit on behalf of themselves and all those who are present or potential beneficiaries of the Manchester CDBG program seeking to enjoin the Town's withdrawal of its pending application for Fifth Year Funds. They also seek a declaration that the ordinance is void and unconstitutional. A hearing on this motion for a preliminary injunction was scheduled for April 27, 1979. On the eve of the hearing, and the day before the ordinance became effective, the Town's Board of Directors voted to withdraw their application from HUD. Before action could be taken implementing that decision, however, on April 27, 1979 a temporary restraining order was issued by this court barring the defendant-officials of the

6. The text of the petition, and ultimately, the new ordinance reads as follows:

"That from the effective date of this ordinance until January 1, 1981, said town and its officers are barred from taking any action to apply for or to execute any agreement pertaining to any Community Development Block Grant program with the United States Department of Housing and Urban Development other than Community Development Block Grant programs for which application was made, approved and was granted prior to January 1, 1979."

Town of Manchester "from taking any action . . . to withdraw the Town's application for the Fifth Year Community Development Block Grant presently pending before the Department of Housing and Urban Development." That order was extended, on May 7, 1979, for an additional ten days until May 17, 1979.

## II. DISCUSSION

■ "The purpose of a preliminary injunction is to maintain the status quo pending a final determination of the merits . . . .. It is an extraordinary remedy . . . .." *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969) (citations omitted).

The test to be applied in deciding whether a preliminary injunction is appropriate in these circumstances recently has been made clear:

"The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir. 1978); *see also New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 750, 755 (2d Cir. 1977); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358–59 (2d Cir. 1976)."

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, at 72 (2d Cir. 1979) (footnote. omitted). *See also* Mulligan, *Foreword—Preliminary Injunction in the Second Circuit*, 43 Brooklyn L.Rev. 831

(1977). The Court of Appeals earlier explained the alternative standards on which to preliminarily evaluate the merits as follows:

" '[T]he burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief.' *Dino De Laurentiis Cinematografica, S. P. A. v. D–150, Inc.*, supra, [366 F.2d 373, 375 (2d Cir. 1966)]. In such a case, the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation."

*Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969) (some citations omitted). *See also San Filippo v. United Brotherhood of Carpenters and Joiners*, 525 F.2d 508, 511–12 (2d Cir. 1975); *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 692–99 (2d Cir. 1973).

### A. Irreparable Harm

From the evidence presented at the hearing on April 27, 1979, and based on the briefs submitted, it appears that irreparable harm will occur if the application is withdrawn now. The irreparability of the harm here to the plaintiffs and their putative class emerges from the statutory mechanism placing a burden of disapproval on HUD in its review of applications for community development block grants.[7] The Act provides, and HUD Area Director John W. McClean testified, that as an "entitlement city," funds are set aside for Manchester, and the Town can automatically receive those funds without further action by HUD after the lapse of a 75-day period which

---

7. As stated previously by this court:

"Congress intended to streamline the administration of these federal programs, by minimizing HUD's 'front-end' review, substituting annual performance monitoring at the time when the future funding levels of grants to the particular community would be determined. In place of the elaborate administrative review by federal officials which preced-

ed grant approval under the ten [predecessor] programs, the new statute establishes a 75-day period, within which HUD must disapprove the application, or else it is automatically approved. Furthermore, the statute directs HUD to approve the grant unless certain very limited conditions exist."

*City of Hartford v. Hills, supra*, 408 F.Supp. at 897 (footnotes omitted).

commenced on April 12, 1979, the date the application was filed. *See* 42 U.S.C. § 5304(f); 24 C.F.R. § 570.311(d). McClean also testified that if the Town's application were withdrawn those funds would be allocated to other communities in Connecticut which have lower priority but have stated financial needs that will otherwise go unmet.[8]

The named plaintiffs have made clear in unrebutted testimony at the hearing on this motion that programs from which they benefit would likely be discontinued if the community development funds were allocated to other towns. In addition, it appears from statements of Town officials that the process of alleviating the racially restricted housing situation in Manchester, a process which the Town government had begun, would be halted if funding for expansion of low-income housing in conformity with the HAP[9] and the Fair Housing Office were not available from HUD. To allow the Town's efforts at alleviation of the problem to cease would deprive those who would benefit from racially nondiscriminatory housing conditions of this nascent opportunity for a racially integrated community.

As has recently been pointed out:

"If courts may grant relief only when plaintiffs have made a clear case on the record, many instances will remain where race-dependent decisions are strongly suspected but cannot be proved. Although this is not essentially different from the difficulty facing the proponents in most litigation seeking to overturn government policies, it is especially troubling in the race area. The accumulation of suspect-ed but unproved race-dependent conduct, such as decisions to zone out low income housing, may systematically deprive minorities of important benefits. And the very existence of a state of affairs which 'everyone knows' is based on racial discrimination but no one will remedy is demoralizing and stigmatic."

Brest, *Foreword: In Defense of the Antidiscrimination Principle*, 90 Harv.L.Rev. 1, 28–29 (1976). *See also, Gladstone Realtors v. Village of Bellwood*, —— U.S. ——, ——, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 208, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

**B.  *The Merits***

■   The second aspect of the Second Circuit's standard for issuance of a preliminary injunction requires a preliminary evaluation of the merits of plaintiffs' claims. In testing the merits at this stage there must be a showing of "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, *supra*, at 72.

■   In testing the merits, the initial question, of course, is whether plaintiffs have stated claims which are cognizable in law. This question is also put before me by the defendants' motion to dismiss for failure to state a claim on which relief can be granted. It is clear to me that plaintiffs have failed to state a claim in their First,

---

**8.** It is therefore clear, partly because HUD is not a defendant here, that if it should be necessary for meaningful relief to be ultimately fashioned in this lawsuit, the 75-day waiting period must not be allowed to be tolled and the entitlement funds must not be allowed to be disbursed elsewhere.

**9.** Although a Housing Assistance Plan (HAP) and the funds from the CDBG which would implement it are directed toward expanding housing opportunities for low-income persons, *cf. San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (excluding classifications based on income from the most rigorous equal protection clause scrutiny), the racial implications of the Town's commitment to a HAP cannot be overlooked. One purpose of a HAP, as discussed above, is to further fair housing by promoting, on a regional basis, "spatial deconcentration of housing opportunities for lower income persons." 24 C.F.R. § 570.306(2). And, of course, "courts are not blind to the fact that racial minorities are disproportionately represented in the lower-income levels of our society." *Citizens Committee for Faraday Wood v. Lindsay*, 507 F.2d 1065, 1069 (2d Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975).

Second, and Fourth Causes of Action, and I grant the motion to dismiss as to those counts.[10]

It is plaintiffs' Third Cause of Action, however, which I hold states a claim. I base this conclusion on an analysis of the pleadings in light of both statutory and constitutional doctrines. Although plaintiffs have not explicitly pleaded a violation of the Constitution, as they have a violation of Title VIII of the Civil Rights Act of 1968, my reading of the complaint implicates the equal protection clause of the fourteenth amendment, as well as Title VIII; and I find a cause of action stated on both grounds.

### 1. *Equal Protection Clause*

#### a. *Sufficiency of the Pleading*

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."

*Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). And such official action is no less prohibited if the racial discrimination appears on its face, *Alexander v. Louisiana,* 405 U.S. 625, 628–29, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), or is camouflaged behind facially-neutral official conduct. *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The problem, however, for the courts has been in establishing the level and burden of proof which a plaintiff must carry before a court will require that government officials accused of facially-neutral discriminatory conduct justify that conduct by showing a compelling state interest.

The Supreme Court has recently made clear that the equal protection clause's prohibition against racial discrimination will not be invoked where official conduct is facially-neutral unless the plaintiffs can show that the defendant officials have a racially discriminatory intent. *Washington v. Davis, supra,* 426 U.S. at 247–48, 96 S.Ct. 2040. *See also Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Village of Arlington Heights v. Metropoli-*

10. Due to the time constraints imposed in rendering a decision on these motions, I am not able to engage in an extended discussion of the questions raised by these three causes of action, and it is not necessary to my decision to grant equitable relief.

Plaintiffs' First Cause of Action alleges that the referendum which enacted the ordinance imposing a moratorium on the Town's participation in the CDBG program is void because it violates the "Supremacy Clause" of the United States Constitution. This is based on the theory that the Housing and Community Development Act of 1974, as a supreme federal law, bars participatory activity by citizens of a community which would have the effect of vetoing decisions on CDBG applications made by the elected governmental officials of the town. I do not read the Act or its legislative history to control referenda on whether or not to apply for a block grant as distinguished from how to allocate funds received.

Plaintiffs' Second Cause of Action alleges that the referendum ordinance is void as not conforming to various Connecticut statutes. This claim is not within the subject-matter jurisdiction of a federal court; and, because of my ruling dismissing the First Cause of Action, I decline to exercise my discretion to create pendent jurisdiction over this claim. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Plaintiffs' Fourth Cause of Action alleges that the referendum ordinance is void because it violates the "Contracts Clause," U.S.Const. art. I, § 10, cl. 1. They argue that the enactment of the ordinance impairs the Town's contractual obligations under the Fourth Year CDBG. Although "the Contracts Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties," *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17, 97 S.Ct. 1505, 1515, 52 L.Ed.2d 92 (1977), nothing in the complaint can be construed to allege contractual obligations between the Town and HUD regarding the initiation or preparation of a Fifth Year CDGB application. If the Town has breached its obligations under grants for prior years, which, at bottom, is all that plaintiffs' Fourth Cause of Action alleges, the remedy lies in a cause of action for breach by HUD against the Town. The Contracts Clause is not implicated for these plaintiffs.

*tan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

Plaintiffs have clearly alleged such a discriminatory intent on the part of the officials of the Town of Manchester who voted to withdraw their application for the Fifth Year Block Grant. The pertinent portions of plaintiffs' complaint, read as follows:

"94. The action of the defendant . . . to withdraw the present application for funds from the CDBG program and the two year moratorium by action or inaction has shown and continues to show a clear design, intent, and purpose to enforce and maintain segregated residential patterns in the Town of Manchester. Moreover, such action by defendant clearly excludes blacks or hispanic citizens as prospective residents of the Town of Manchester. Defendants have implemented such a racially discriminatory design, intent and purpose which has a disparate impact on minorities and perpetuates previous segregation of the Town of Manchester. The present population of the Town of Manchester is over 50,000. According to the 1970 census only .575[%] of the population are minority. . . .

The defendant's actions have been taken under color of law, custom and usage so as to deprive plaintiff and others on whose behalf they bring this action their right to fair and open housing or otherwise make unavailable . . . a dwelling to any person contrary to . . . the Fair Housing Act of 1968.

". . .

"96. The effect of defendants' withdrawal from the CDBG program is to perpetuate the segregated conditions of the past and to continue discriminatory housing practices which injure the white residents of the Town of Manchester who lose the social benefits of living in an integrated community and who suffer embarrassment and economic damage in social, business and professional activities from being stigmatized as residents of a white segregated community."

The likelihood of proving these allegations at trial is not the test on which to judge a motion to dismiss. Rather, I must take the allegations as true. *Dacey v. New York County Lawyers' Ass'n*, 423 F.2d 188 (2d Cir. 1969), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970). So taken, the allegations of the plaintiffs' Third Cause of Action do state a claim on which relief can be granted and therefore the motion to dismiss it must be denied.

b. *Fair Ground for Litigation*

The appropriateness of a preliminary injunction, however, requires a deeper inquiry. The evidence presented to me thus far must show "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the [plaintiffs]." *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, *supra*, at 72, in order to grant the preliminary injunction.

The decision of the Board of Directors of Manchester to withdraw the Town's application for a Fifth Year Grant does not appear on its face to be racially discriminatory. Necessarily therefore, I am compelled to determine whether there is sufficient indication in the record before me to create a fair ground for litigation that a racially discriminatory purpose was a motivating factor in the decision to withdraw the application. In this regard, I am mindful initially of the long-standing judicial reluctance to make conclusions of constitutionally impermissible intent on a less than fully litigated record. *Mazaleski v. Treusdell*, 183 U.S.App.D.C. 182, 198, 562 F.2d 701, 717 (1977). *See also Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Friedman v. Meyers*, 482 F.2d 435 (2d Cir. 1973).

Although *Davis* requires that such a conclusion be reached in order to invoke the constitutional prohibition on racial discrimination, *Davis* also permits the proving of this impermissible motivating purpose by circumstantial as well as direct evidence. 426 U.S. at 242, 96 S.Ct. 2040. In a more recent opinion, Justice Powell, speaking for seven members of the Court, went to considerable lengths to explain the evidentiary

showing which is necessary to establish impermissible discriminatory intent:

"*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it 'bears more heavily on one race than another,' *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct., at 2049, may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); . . . *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo,* impact alone is not determinative, and the Court must look to other evidence.

"The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. . . . The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's

purposes. . . . For example, if the property involved here always had been zoned R–5 but suddenly was changed to R–3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."

*Village of Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. at 265–67, 97 S.Ct., at 563–565 (some citations omitted).

Under the teaching of *Arlington Heights* therefore, invidious discriminatory purpose can be gleaned through an inquiry which weighs a number of factors, each of which will be discussed below:

1. discriminatory impact;
2. the historical background of the attached decision;
3. the sequence of events leading up to the challenged decision;
4. departures from normal procedural sequences; and
5. departures from normal substantive criteria.

*Id.; Resident Advisory Board v. Rizzo,* 564 F.2d 126, 143 (3d Cir. 1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978).

### (1) *Discriminatory impact*

Here, there is sufficient evidence that the decision to withdraw the application will have a racially discriminatory impact to create a fair ground for litigating the facts of the matter. Plaintiffs presented unrebutted evidence at the hearing on the preliminary injunction that the Town of Manchester is a white enclave which has less than 1% of its population which are identified as minorities, while the Standard Metropolitan Statistical Area (SMSA) of which it is a part is nearly 30% minority. (Plaintiffs'

Exhibit # 3). Documentary evidence was also presented at the hearing showing that another primarily white suburban town in the Hartford region SMSA, Bloomfield, which early-on had taken widely-publicized steps to alleviate racially exclusionary housing patterns had achieved a level of 13.4% minority population. (Plaintiffs' Exhibit # 3). *See generally* Dept. of Commerce, *Census Tracts: 1970 Census of Population & Housing, Hartford, Conn. S.M.S.A.* (1972).

The commitment of the Town of Manchester to a fair housing campaign and to its Housing Assistance Plan for increased low-income housing both indicated some effort by Town officials to begin a process of alleviating the racially exclusionary housing patterns in the Town. Both of these efforts were funded by the CDBG program. Therefore, the impact of the decision to withdraw from CDBG funding would have the effect of stifling these efforts for racially integrated housing. Similarly, because funds in the application are allocated for rehabilitation of low-income housing, a decision not to apply for those funds would have a greater impact on minorities throughout the Hartford metropolitan region, and by curtailing housing opportunities for minorities would have the effect of discriminating against those groups.[11]

The statistical record of this impact has not been fully or adequately developed. However, the unrebutted evidence of limited housing for minorities in the Town coupled with the likely effect of ceasing the efforts to correct that condition raises a sufficiently serious question as to the racially discriminatory impact of the decision to withdraw the application to create a fair ground for a full hearing on the merits.

### (2) & (3) *The historical background and sequence of events leading up to the decision*

The historical background of the decision to withdraw the Town's application begins, of course, with the racially limited housing opportunities in Manchester described above. It continues through the four years in which HUD provided funds to the Town based on assurances of the Town that it would affirmatively further fair housing as mandated by Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631. It was only after the Town began to implement these assurances in the form of establishing a Fair Housing Opportunity Office with CDBG funds, and hired an activist black leader from Hartford to promote integrated housing, and after the commencement of the implementation of a HAP to provide low-income housing that the ground-swell of overt public opposition to the Town's participation in the HUD program developed. It was in response to this opposition from some of the citizenry of the Town, as finally expressed in the referendum, that the Board of Directors reversed its decision to participate and voted to withdraw the Fifth Year application.

### (4) *Departure from normal procedural sequences*

The decision to withdraw the application two weeks after its submission and after months of staff work and community hearings is patently a marked departure from normal procedural sequences. The timing of the decision, on the eve of the federal court hearing and the day before the ordinance took effect suggests the question of a purpose to evade judicial evaluation of the decision against a constitutional standard. Such action raises the kind of question

11. On a broader scale, the regional impact of suburban exclusionary housing policies has been amply discussed and documented in several celebrated cases in the last decade. *See, e. g., Construction Indus. Ass'n v. City of Petaluma,* 375 F.Supp. 574, 581 (N.D.Cal.1974), *rev'd on other grounds,* 522 F.2d 897 (9th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976); *Southern Burlington County NAACP v. Township of Mount Laurel,* 67 N.J. 151, 336 A.2d 713 (1975); *Berenson v.*

*Town of New Castle,* Equal Opportunity in Housing (P–H), ¶ 16,521 (Sup.Ct., Westchester County, N.Y. Dec. 6, 1977), *modified,* 67 App. Div.2d 506, 415 N.Y.S.2d 669 (1979), *remanded from* 38 N.Y.2d 102, 378 N.Y.S.2d 672, 341 N.E.2d 236 (1975). *See generally City of Hartford v. Hills, supra,* 408 F.Supp. at 901–02; Note, *Judicial Limitations on Local Growth Controls: Regional Needs as an Element of the General Welfare,* 66 Calif.L.Rev. 373, 377–79 (1978).

which establishes a fair ground for a more deliberate investigation.

### (5) *Departure from normal substantive criteria*

Similarly the only announced reason for the decision to withdraw the application was the vote on the referendum. Admittedly, the response of an elected town council to a referendum of the electors does not alone suggest that the council members themselves intended to discriminate against racial minorities. One would expect, however, that officials charged with responsibility for the public fisc would base their decision to participate in a federal grant program on the financial needs of the town. Where another criterion for the decision is expressly stated, an inquiry into the potential racial underpinnings of that criterion would seem warranted. Thus, where the decision to withdraw the application would not have been taken but for the majoritarian expression of their constituency for racial exclusivity, a sufficiently serious question regarding their motivations appears to have been raised to create a fair ground for litigation.[12] *See Cooper v. Aaron,* 358 U.S. 1, 8, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

In ordering the City of Philadelphia to build a federally-funded public housing project, the Court of Appeals for the Third Circuit recently said: "Where . . . the applicable *Arlington Heights* 'evidentiary sources' for a gleaning of official intent all point to unusual, aberrant circumstances surrounding the . . . action, which reveal direct and circumstantial proof of racial bias . . ." *Resident Advisory. Board v. Rizzo, supra,* 564 F.2d at 144, sufficiently serious questions going to the merits of plaintiffs' claim of purposeful racially discriminatory conduct have been raised to make them a fair ground for litigation.

"Indeed, the *Arlington Heights* Court all but anticipated this very case when it observed that a change in zoning laws preventing construction in the face of the announcement of a plan to erect integrated housing would present 'a far different case' than *Arlington Heights.* The record here reveals this to be, by analogy, that 'far different' case. The City of Philadelphia changed its stance from passive support for the Whitman project to active opposition only after the initiation of bias-tinged local demonstrations. In terminating the Whitman project, the City violated the plaintiffs' right to equal protection. *See also Cooper v. Aaron,* 358 U.S. 1, 8, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (school board previously going forward with preparation of desegregation plans held to have denied equal protection when in face of community and state governmental protests, it abandoned plans)."

*Id.* at 145.

■■■ It should be noted that inquiry into the purpose of the decision of the Board of Directors to withdraw the application will of course start with the intent of the individual members in voting to do so. However, the members' profession of a purpose of responding to the will of their constituency only pushes the level of judicial inquiry deeper where suspicion of racial motivations has been adequately suggested. Elected officials cannot excuse their racially discriminatory actions by pointing to popular mandate to so act. The majority are not permitted under the equal protection clause to purposefully cause discrimination against racial minorities to any greater extent than the elected officials themselves. *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Reitman v. Mulkey,* 387 U.S. 369, 373–76, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1966); *Cooper v. Aaron, supra,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5. *See generally* Bell, *The Referendum: Democracy's Barrier to Racial Equality,* 54 Wash.L. Rev. 1 (1978). It is significant that in *James v. Valtierra,* 402 U.S. 137, 91 S.Ct.

---

12. It is important to emphasize, as I have elsewhere, that "[o]f course, communities can choose not to participate in the [CDBG] program." *City of Hartford v. Hills, supra,* 408 F.Supp. at 902. But once participation has voluntarily begun, and an application for further participation has been submitted, the withdrawal of that application under the unusual circumstances of this case justifies a fuller and more deliberate judicial investigation.

1331, 28 L.Ed.2d 678 (1970), on which defendants here so heavily rely, Justice Black made clear that the Court's decision to approve the referendum in that case presumed that no burden was placed on racial minorities by the electorate's action. *Id.* at 140–41, 91 S.Ct. 1331.

■ In view of the foregoing preliminary considerations, it appears that a sufficiently serious question has been developed as to the possibility of there being a constitutionally identifiable discriminatory purpose underlying the decision to withdraw the application so as to create a fair ground under the equal protection clause for a full hearing on the merits.

### 2. *Title VIII*

Plaintiffs have alleged explicitly that the conduct evaluated above in light of the equal protection clause also violates Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631. Specifically, they claim a violation of § 3604(a) which provides, in pertinent part, as follows:

"[I]t shall be unlawful—

(a) To refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin." (Emphasis added.)

It has been held in this Circuit that a showing of discriminatory intent is necessary in order for plaintiff to make out a prima facie case for a violation of this section of Title VIII. *Boyd v. Lefrak Organization,* 509 F.2d 1110 (2d Cir.), *cert. denied,* 423 U.S. 896, 96 S.Ct. 197, 46 L.Ed.2d 129 (1975). *See also Citizens Committee for Faraday Wood v. Lindsay,* 507 F.2d 1065 (2d Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975); *Acevedo v. Nassau County,* 500 F.2d 1078 (2d Cir. 1974). To the extent these cases can be interpreted to hold that a violation of Title VIII by public officials can only be established upon proof of a racially discriminatory purpose they are contradicted by the view taken in the Third, *Resident Advisory Board v. Rizzo, supra,* 564 F.2d 126, the Seventh, *Metropolitan Housing Develop-*ment Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1295 (7th Cir. 1977), *on remand from* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, *supra, cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), and the Eighth, *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), Circuits, that a prima facie case of racial discrimination by public officials can be established under Title VIII by a showing of a racially discriminatory impact. In the Second Circuit, also, this view has been expressed. *See Kennedy Park Homes Ass'n v. City of Lackawanna,* 436 F.2d 108 (2d Cir. 1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). *See generally* Schwemm, *Discriminatory Effect and the Fair Housing Act,* 54 Notre Dame Law. 199 (1978). In deciding whether a preliminary injunction is appropriate under the circumstances of this case as they have been thus far developed, I am not required at this stage of the case to choose among the conflicting views in this Circuit or among the other Circuits.

It is clear from my evaluation of the complaint, *supra* at 495–496, that the plaintiffs have alleged a discriminatory intent. Therefore, as a matter of pleading, their Third Cause of Action does state a claim upon which relief can be granted under either view of the test required in a Title VIII case. Similarly, my discussion, *supra,* of the circumstantial evidence present in this case indicates a discriminatory intent by the Board of Directors which would, for the limited purpose of granting a preliminary injunction, satisfy even the more rigorous of the Title VIII standards favored by one of the decisions in this Circuit. *Cf. Arlington Heights, supra,* 429 U.S. at 271, 97 S.Ct. 555 (where case was remanded on the Title VIII ground after holding lack of factual circumstances showing discriminatory intent on equal protection ground). Based on the criteria adopted from *Arlington Heights* for showing a discriminatory intent of constitutional magnitude, I therefore hold that under Title VIII also sufficiently serious questions of such

intent have been raised to create a fair ground for litigation.

Having found that appropriate questions exist under the equal protection clause and under Title VIII for further litigation, there is a final consideration required in this Circuit for the granting of a preliminary injunction, viz., "[that the] balance of hardships [tip] decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., supra*, at 72.

### C. Balance of Hardships

The only evidence presented to me of hardship in this case is that of the plaintiffs. They have described hardships which they would suffer from the abandonment of housing and community projects proposed to be further funded in the Fifth Year Grant application. One of them has also described social and psychological benefits that she and her children would receive from the official efforts at alleviation of racially exclusionary housing patterns in the Town, *see Gladstone Realtors v. Village of Bellwood, supra*, —— U.S. at ——, n.24, 99 S.Ct. 1601; *Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 94–95, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), and the concomitant harm that would result from ceasing these efforts, already underway from funding in the Fourth Year Grant and proposed to be further funded in the Fifth Year application.

The defendants brought out at the hearing on this motion and argue in their brief that it is conceivable that some of the community development projects may be funded alternatively by state, local or private sources. Admittedly this is a possibility, but there is no showing in the record that this will happen. Rather, the only evidence before me is testimony that these projects will cease if the CDBG is not applied for this year.

On the other hand, the defendants have not put before me, at this early stage of the litigation, any evidence of hardship to them if the application remains extant. I find that the hardships in this case are decidedly on the side of the plaintiffs.

Therefore, under the criteria adopted in this Circuit for maintaining the status quo pending a full hearing on the merits, a preliminary injunction which bars the defendants from withdrawing the Fifth Year application is appropriate on both statutory and constitutional grounds.

### III. THE SCOPE OF THE PRELIMINARY INJUNCTION

"Notwithstanding the Supreme Court's observation in *Swann* [*Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554] that 'the scope of a district court's equitable powers to remedy past wrongs is broad', . . the Supreme Court has in recent equal protection cases given careful scrutiny to the choice of remedy to assure that the relief granted is no broader than that necessary to remove the violation and its effects. . . . 'Once a constitutional violation is found, a federal court is required to tailor "the scope of the remedy" to fit "the nature of the violation,"' *Brinkman* [*Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851], *supra*, [433] U.S. at [420], 97 S.Ct. at 2775. . . . In short, the federal equitable remedy must cure the constitutional defect but the dosage must not exceed that necessary to effect the cure."

*Resident Advisory Board v. Rizzo, supra*, 564 F.2d at 145 (some citations and footnote omitted).

Here my objectives are only to preserve the status quo pending a full hearing on the merits of plaintiffs' statutory and implied equal protection claims. The only judgment I now make regarding those merits is that they have been presented thus far so as to raise a sufficiently serious question as to the impermissibility of the Board of Directors' action. On the record before me now, I cannot say whether the action was motivated by an invidiously racially discriminatory purpose, or even, indeed, whether there is a racially discriminatory impact from the decision to withdraw the

Fifth Year application. However, sufficiently serious questions have been raised as to those issues to create a fair ground for litigating them. A final determination awaits a fuller hearing. Until that time, in order to prevent disbursement of the funds to other municipal claimants, I order the defendant officials of the Town of Manchester to take no action to withdraw or otherwise hinder favorable action on the application for the Fifth Year Community Development Block Grant now pending before the Department of Housing and Urban Development. An early trial on the merits will be expedited.

SO ORDERED.